**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **D5 IRON WORKS, INC., RICHARD LINDNER, SCOTT KUDINGO, BILL TONNESEN, THE ESTATE OF JOE WEIL, and HARRY HARPER,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) | **2:16CV200-PPS/JPK** |
| **LOCAL 395 IRONWORKERS, AFL-CIO, THOMAS WILLIAMSON, SR., SEAN GRISWALD, JEFFREY VEACH, JOSEPH UPCHURCH, and KNOWN AND UNKNOWN CO-CONSPIRATORS,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

This litigation arises from an ugly incident of labor violence that occurred on January 7, 2016, in which plaintiffs Richard Lindner, Scott Kudingo, Bill Tonnesen, Joe Weil and Harry Harper, all ironworkers and employees of plaintiff D5 Iron Works, Inc., were set upon by defendants Thomas Williamson, Sr., Jeffrey Veach and other members of defendant Ironworkers Local 395.[1]  The matter has languished for more than five years, largely due to the case being stayed during the pendency of a related criminal case against defendants Jeffrey Veach and Thomas Williamson, Sr.  [DE 227, 249.]  Although the allegations are plainly serious, the First Amended Complaint is a

---

[1] The claims of the Estate of Joe Weil (Counts IX, X and XI of the First Amended Complaint) have been dismissed with prejudice, and the claims against defendants Sean Griswald and Joseph Upchurch dismissed without prejudice.  [DE 164.]

blunderbuss of more than twenty counts involving a variety of sometimes contradictory theories. Presently before me are a slew of motions for summary judgment relating to many of those counts.[2]

Rule 56 of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A motion for summary judgment has been described as the time in a lawsuit to "put up or shut up."  *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, not every dispute between the parties makes summary judgment inappropriate.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*.  The determination what material facts are undisputed is obviously critical in the summary judgment context, and the rule requires the parties to support facts, and disputes of fact, by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).

---

[2]   Other motions addressing evidentiary issues [DE 181, 182 and 265] and a motion for sanctions [DE 272] will be the subjects of separate opinions.

**Undisputed Material Facts**

Dyer Baptist Church contracted with Lagestee-Mulder, a general contractor, to construct the Plum Creek Christian Academy.  [DE 284-8 at 51, 8:22-9:1; DE 267-2 at 185, 38:12-15.]  The job site was surrounded by a chainlink fence.  [DE 267-2 at 196, 73:11-12.] Lagestee-Mulder subcontracted the erection of the structural steel frame on the Plum Creek School job to D5 Iron Works, Inc.  [DE 267-2 at 162, 9:1; DE 267-2 at 187, 42:12-14; DE 284-8 at 63, 38:12-15.]

Defendant Local 395 Ironworkers, AFL-CIO is a labor organization headquartered in Portage, Indiana.  [DE 284-8 at 10, ¶11.]  Local 395 is comprised of approximately 854 members. [DE 284-8 at 80, ¶3.]  At all times relevant to the allegations of the First Amended Complaint, Tom Williamson, Sr. was a Business Agent with Local 395, and Jeffrey Veach was a Business Agent, President, and Organizer of Local 395.  [DE 284-8 at 89, 31:13-15; DE 284-8 at 94, 116:21-23.]

On January 6, 2016, D5 mobilized to perform the Plum Creek contract. Equipment and personnel were driven from Woodstock, Illinois to Dyer, Indiana.  D5 owner Richard Lindner was in charge.  Scott Kudingo, Bill Tonnesen, and Harry Harper are all employees of D5.  [DE 284-8 at 72, 14:16-18; DE 284-8 at 77, 10:11-16.] Scott Kudingo was the crane operator.  [DE 267-2 at 204, 124:10-12; DE 267-2 at 211, 34:11-12; DE 267-2-at 231, 235:7-9.]  Harry Harper was a welder.  [DE 267-2 at 210, 16:21.]

Plaintiffs arrived to work on the job site at 11:00 a.m. on January 6, 2016.  [DE 267-3 at 3, 50:19.]  They offloaded structural steel and set machines in place to begin

steel erection.  That's when Defendant Williamson entered the scene walking onto the

job site and requesting that plaintiff Lindner, who was on a manlift, sign a labor

agreement with Local 395.  [DE 267-2 at 184, 37:19-21; at 185, 38:2.]  Williamson asked

who the general contractor was and Lindner told him it was Lagestee-Mulder.  [DE 267-

2 at 185, 38:12-15.]  Lindner declined the invitation to sign a union contract, whereupon

Williamson became irate and yelled at Lindner.  [DE 267-2 at 185, 38:6-11.] Despite

being told to leave the premises, Williamson refused to depart.  [DE 267-2 at 188, 59:18-

24.]

At no time did Dyer Baptist Church authorize Local 395 to be on the job site.  [DE

267-2 at 165, 16:4-10; DE 267-3 at 31, 77:21-24.]  Nonetheless, Williamson proceeded to

the Dyer Baptist Church building, where he spoke with an assistant pastor named Peter

Knezevich.  [DE 267-3 at 17, 12:6-24.]  Williamson told Pastor Knezevich that the men

working on the job site were not part of the Ironworkers union, and that it was

unethical for the church to employ non-union workers.  [DE 267-3 at 20, 19:19; at 19,

18:4-6.]  Williamson communicated that he wanted the current non-union work to stop

and for the church to hire Local 395 labor to complete the work.  [DE 267-3 at 21, 20:12-

16; at 22, 21:1-4.]  Williamson handed Pastor Knezevich his business card.  [DE 267-3 at

17, 12:9; at 21, 20:13.]

Pastor Knezevich testified in his deposition that because the conversation with

Williamson left him feeling "uneasy" and that "something bad was coming," he

watched Williamson's departure through the window of the church.  [DE 267-3 at 24,

23:1-12.]  Although Williamson's demeanor was not at all threatening, Pastor Knezevich concluded from Williamson's tone, what he said, and what he implied, that Williamson had communicated that "this is not the end of things, I don't want those people out there, and something's going to happen so that you understand clearly that we don't want them out there."  [DE 267-3 at 30, 43:10-18.]  Pastor Knezevich saw Williamson get into a car, and drive it around the parking lot adjacent to the worksite, stopping at different angles, which suggested to Knezevich that Williamson was taking pictures. [DE 267-3 at 24, 23:15; at 25, 25:7-18.]  The next morning, January 7, Pastor Knezevich told another Dyer Baptist Pastor, David Atkinson, about the encounter with Williamson and his concern that "there could be trouble from the union." [DE 267-2 at 164, 13:10-13.]

Ron Ware is the Business Manager of Local 395.  [DE 284-8 at 88, 10:16-18.]  As Business Manager, Ware is responsible for the management of all elected officers and employees, and their day-to-day activities.  [DE 284-8 at 92, 80:24 - 81:2; at 93, 81:11-17.] The duties of Williamson and Veach as Business Agents of Local 395 included overseeing signatory contractors and engaging in organizing activities.  [DE 284-8 at 94, 116:9-18.]

Ware spoke to Williamson at 11:06 a.m. on January 7, and they discussed efforts "to get a union contractor to perform that work" for Dyer Baptist Church.  [DE 267-33 at 39, 70:15-18.]  Williamson returned to the job site on January 7 and entered with Veach. [DE 267-2 at 188, 59:3-7.]  From his position on the manlift, plaintiff Lindner told

5

Williamson that he could not be on the site, that he was interfering with D5's work, was trespassing, and was not covered by insurance. [DE 267-2 at 188, 59:10-13.] Williamson responded that Lindner needed to come down and make him leave. [DE 267-2 at 188, 59:21-24.] Lindner called for plaintiff Harper. [DE 267-2 at 212, 44:19-23.]

When Lindner descended from the manlift and told Williamson to leave, Williamson stated this was a union area, called Lindner a "cunt," and grabbed Lindner's safety harness. [DE 267-2 at 189, 60:10-23; DE 267-2 at 215, 56:21-23.] When Williamson released his grip, he stated D5 should sign a labor agreement and warned Lindner that because of the refusal, "I'm taking this back to Old School." [DE 267-2 at 191, 63:24-64:1; DE 267-3 at 47, 32:15-16.] Lindner saw Williamson leave in a black Ford Expedition or Explorer. [DE 267-2 at 190, 61:13-14; DE 267-2 at 227, 69:12-19.] The incident had lasted 10 to 15 minutes. [DE 267-2 at 192, 64:12.]

Later that day, at around 3:00 p.m., Pastor Atkinson saw four or five vehicles pull into the parking lot between the church building and the job site "almost in unison, doors shutting in unison, just kind of this clockwork thing." [DE 267-2 at 167, 28:21-24.] The men, approximately 11 or 12 in number, "walked briskly...on a mission, with purpose." [DE 67-2 at 169, 32:19-22; at 197, 74:16; DE 180 at ¶5.] Atkinson saw the men go onto the construction site, and a few minutes later "saw guys in their work clothes kind of running in all directions...across 213th Street...across Calumet Avenue not waiting for red and green lights, just running." [DE 267-2 at 168, 29:2-12; DE 267-2 at

195, 72:19-24.]  Pastor Atkinson called 911 when he saw the "panic-stricken men fleeing the site."  [DE 267-2 at 172, 40:16-18.]

Williamson and Veach were among the Local 395 members who had come to the job site that afternoon.  Two of the vehicles photographed leaving the job site were owned by Local 395 and used exclusively by Williamson and Veach.  [DE 267-3 at 37, 63:8-9; at 38, 65:12-14; DE 267-3 at 44, 19:8-10.]  The Local 395 group rushed the job site, picked up cribbage (wood used in shipping steel) and attacked plaintiffs.  [DE 267-2 at 214, 69:11 - 70:7; DE 267-2 at 193, 65:13-18.]  There were no picket signs, banners, leaflets, inflatable rats, rat signs or other indicia explaining why the men were there. [DE 267-2 at 177, 49:2-13; at 180, 71:13-17; DE 267-3 at 12, 101:2-14.]

Harper testified in his deposition that:

When they were chasing me, these guys were yelling at me this is 395's area, you fucking scabs.  The one guy was yelling I'm going to kill you....So I was running basically for my life because you didn't know what these guys were going to do because they were picking up clubs and picking up wood that could potentially end your life if you get hit in the head with it.

[DE 267-2 at 194, 66:12-19.]

Local 395 members grabbed plaintiff Kudingo walking to a port-a-potty, punched him, threw him to the ground, and beat him by clubbing and kicking Kudingo in the face, arms, back and body.  [DE 267-2 at 224, 64:5-19; DE 267-2 at 193, 65:14-15; DE 267-3 at 10, 94:12.]  They pummeled Kudingo, breaking his jaw in three places.  [DE 267-3 at 13, 114:14-17; 267-2 at 233, 245:15-22.]  Kudingo heard the sounds of his jaw

breaking as he was kicked with steel-toed boots.  [DE 267-2 at 299, 102:19; at 233, 245:9-22.]  As he was being beaten, Kudingo "was screaming for [his] life."  [DE 267-2 at 228, 74:5.]  During the assault, Kudingo heard Local 395 members yelling "This is union work!," "This is 395's work!," This is 395's territory!," "Don't come back!," and "Scab mother fucker!."  [DE 267-2 at 228, 74:7-14; at 230, 233:5-18; DE 267-2 at 194, 66:12-14.]

When Lindner saw the attack on Kudingo, he yelled for the Local 395 members to get off of him.  [DE 267-2 at 195, 72:9-11.]  A faction of the group broke off and charged plaintiffs Harper, Lindner, and Weil.  [DE 167-2 at 216, 72:21-24; at 217, 74:4-19.]  Lindner ran, scaled the construction fence, and called 911.  [DE 267-2 at 195-96, 72-73.]  A portion of the Local 395 group caught plaintiff Joseph Weil and beat, clubbed him with cribbage, and stomped on him.  [DE 267-2 at 215, 70:5-7.]  Weil suffered physical injuries, including but not limited to a boot-shaped welt mark imprinted on his back.  [DE 267-3 at 11, 97:1-4.]  Harper ran and squeezed through a small opening in the construction fence.  [DE 267-2 at 218, 76:10-12.]  Plaintiff Tonnesen escaped after being hit.  [DE 267-3 at 5, 67:5-11.]

The Local 395 members left in different directions.  [DE 267-3 at 8, 87:1-17.]  They departed "quicker than they pulled in...The cars pulled out one after the other."  [DE 267-2 at 170, 33:9-12.]  Harper and Tonnesen took pictures of vehicles owned by Local 395 as they were leaving the scene.  [DE 267-2 at 219, 84:2-22; at 220, 85:1-15; DE 267-3 at 4, 52:1-20.] Harper identified Tom Williamson, Sr. in one of the photos he took.  [DE 267-2 at 221, 170: 14-22.]

8

The Dyer Police Department dispatched officers to the scene and opened an investigation. Within two weeks all of the plaintiffs had viewed mug shots of various men in a line-up. Each identified defendant Williamson as having been on the job site. All but one also identified Jeffrey Veach as having been on the job site. [DE 267-3 at 46, 29:7-8.]

D5 never returned to finish the work. Instead, three weeks later, it hired a subcontractor and paid it to complete the job, even though the job was 75% complete. [DE 267-2 at 200, 91:16; at 201, 94:19-20; at 202, 95:2-11.]

In answers to interrogatories, Local 395 denied knowledge of who was present at the Dyer Baptist Church. [DE 267-2 at 136, ¶15.] Local 395 made no statements to repudiate or denounce the assault on Plaintiffs on January 7, 2016. [DE 267-2 at 136, ¶16.] Local 395 has imposed no discipline on any member arising from the events of January 6 and 7, 2016. [DE 267-2 at 136, ¶17.] Local 395 has hired no investigators to look into the events of January 7, 2016. [DE 267-3 at 41, 117:16-21.]

Veach and Williamson were charged in this court, in Cause No. 2:18CR89, with an extortion conspiracy in violation of the Hobbs Act, 18 U.S.C. §1951(a), and two counts of attempted Hobbs Act Extortion. Both defendants later entered pleas of guilty to the Hobbs Act conspiracy charge in Count I.

In his plea agreement in *United States v. Jeffrey Veach*, Cause No. 2:18CR89, Veach stipulated to the following facts:

On January 7, 2016, within the Northern District of Indiana, I knowingly and intentionally agreed and conspired with my co-defendant, Thomas Williamson Sr., and others, to use actual and threatened violence to obtain contracts for the union in which I served as an officer, Ironworkers Local 395.  Through my actions, I sought to obtain for Local 395 a labor contract with D5 Iron Works, and Illinois steelworking company ("D5"), and/or a business contract with Lagestee-Mulder, an Illinois construction company.  Prior to January 7, I had learned that D5 was working on a construction project for Dyer Baptist Church in Dyer, Indiana, which is in Local 395's "territory."  I also knew that D5 was not signed up to a labor contract with Local 395.

On the morning of January 7, Williamson and I visited the church jobsite to talk to the owner of D5 and convince him to "sign up" with Local 395 or stop work on the job.  The owner refused and told us to leave the site.  Williamson became angry, calling him a "cunt" and a "scab bastard" and grabbing his jacket.  Williamson also said that we were going to have to "take things back to old school."  By "old school," I understood Williamson to mean committing acts of violence against D5 and its workers.

Williamson and I then gathered up rank-and-file members of Local 395 to return to the jobsite that afternoon.  Local 395 members attacked the D5 workers and beat them with fists and loose pieces of hardwood, kicking them while they were on the ground.  As a result of the attack, one D5 worker sustained serious bodily injury in the form of a broken jaw, that required several surgeries, extended hospitalization, and medical treatment.

Williamson and I initiated the confrontation and did not act in self-defense or "mutual combat."  The purpose of the attack was to intimidate D5 and the general contractor, in order to get the D5 workers off the site and to get Local 395 ironworkers onto the site to complete the job.  I believed that the confrontation, and/or earlier threats, would result in obtaining a contract for Local 395 workers to complete the Church project.

[DE 267-1 at 7-8, ¶8.]

Thomas Williamson, Sr. stipulated to these facts in his plea agreement in *United States v. Thomas Williamson, Sr.*, Cause No. 2:18CR89:

On January 7, 2016, within the Northern District of Indiana, I knowingly and intentionally agreed and conspired with my co-defendant, Jeffrey Veach, and others, to use actual and threatened violence to obtain

contracts for the union in which I served as an officer, Ironworkers Local 395. Through my actions, I sought to obtain for Local 395 a labor contract with D5 Iron Works, an Illinois steelworking company ("D5"), and/or a business contract with Lagestee-Mulder, an Illinois construction company. Prior to January 7, I had learned that D5 was working on a construction project for Dyer Baptist Church in Dyer, Indiana, which is in Local 395's "territory." I also knew that D5 was not signed up to a labor contract with Local 395.

On the afternoon of January 6, I visited the church jobsite in order to talk to the owner of D5 and convince him to "sign up" with Local 395 or stop work on the job. The owner refused and told me I was trespassing on the site. I then went across the street to the Dyer Baptist Church to persuade the church to stop work on the site and use union labor instead. I told a church employee that using non-union labor was "unethical," and that the Church should use "my guys" instead. On the morning of January 7, I returned to the jobsite with Veach, and again insisted that D5 join the union or stop work on the site. When the owner of D5 refused, I became angry, calling him a "cunt" and a "scab bastard" and grabbing his jacket. I also said that we were going to have to "take things back to old school." By "old school," I meant committing acts of violence against D5 and its workers.

Veach and I then gathered up rank-and-file members of Local 395 to return to the jobsite that afternoon. Local 395 members attacked the D5 workers and beat them with fists and loose pieces of hardwood, kicking them while they were on the ground. As a result of the attack, one D5 worker sustained serious bodily injury in the form of a broken jaw, that required several surgeries, extended hospitalization, and medical treatment.

Veach and I initiated the confrontation and did not act in self-defense or "mutual combat." The purpose of the attack was to intimidate D5 and the general contractor, in order to get the D5 workers off the site and to get Local 395 ironworkers onto the site to complete the job. I believed that the confrontation, and/or earlier threats, would result in obtaining a contract for Local 395 workers to complete the Church project.

[DE 267-1 at 16-17, ¶8.]

## Discussion

Before diving into the merits of the several summary judgment motions, it's necessary to determine what impact, if any, the pleas of guilty by Veach and Williamson in the criminal case have on this related civil matter.  I'll start there.

## Impact of Veach and Williamson's Guilty Pleas

Plaintiffs have filed what they call a "Motion to Admit the Criminal Convictions of Defendants Veach and Williamson to Conclusively Establish Facts and Collateral Estoppel." [DE 261.] It is important to decide the motion now because it raises issues about the impact of Veach and Williamson's admissions of fact in support of their guilty pleas to the charge of Hobbs Act extortion, and the ruling impacts the undisputed facts for purposes of summary judgment.  As is customary for guilty pleas, Veach and Williamson stipulated to facts for the purpose of establishing the essential elements of the offense to which they pleaded guilty.  *See* Fed.R.Crim. P. 11. The entirety of that portion of each plea agreement is set forth above.

Williamson and Veach have each separately responded to D5's motion, and plainly state that neither contests that his plea agreement and related statements are admissible against him.  [DE 273, ¶1; DE 274, ¶1.]  Each of them also explicitly acknowledges that he does "not intend to retract any facts or offer any testimony contrary to those he admitted in the criminal case."  [DE 273 at ¶3; DE 274, ¶1.]  Williamson and Veach each "take[] no position with respect to the admissibility of his statements in relation to other Defendants."  [*Id.*]

D5 argues in its motion that the facts stipulated in connection with Williamson's and Veach's guilty pleas are "admissible as evidence against each other and Local 395, as both non-hearsay and as an exception to the hearsay rule." [DE 262 at 7; *see also* DE 262 at 9.] Local 395 has filed no response to D5's motion, and no defendant has objected to the admissibility of the facts Veach and Williamson stipulated to. As an evidentiary matter, then, Veach and Williamson's admissions of fact are a matter of record in this case as well as the criminal case, and are undisputed in each. For that reason, I included the relevant portions of the plea agreements in the Undisputed Material Facts set forth above. The motion to admit the "convictions" is construed as a request to admit evidence of the stipulated facts, and so construed (and unopposed) it will be granted.

However, to the extent that the motion also seeks to "estop Defendants Jeffrey Veach and Thomas Williamson, Sr. from contesting their individual liability," it goes too far. [DE 262 at 1.] D5's motion to admit the convictions does not satisfactorily analyze whether the stipulated facts support or require a finding of the liability of any defendant on a particular claim asserted in the First Amended Complaint. Nor does the motion appropriately and adequately raise issues of collateral estoppel and joint tortfeasor liability so as to warrant my analysis of those matters. The legal conclusions that flow from the stipulated facts, and their implications for various defendants' liability on the many legal theories asserted in the First Amended Complaint, are matters for analysis in the summary judgment context as discussed below. But to the extent D5's motion seeks to "conclusively establish" liability, it will be denied.

## Count I – Secondary Boycott

Count I of the First Amended Complaint is brought against Local 395 and alleges a violation of 29 U.S.C. §158(b)(4)(ii)(B), a provision within §8 of the National Labor Relations Act prohibiting what is called a "secondary boycott."[3]  The particular unlawful practice alleged in Count I is defined in §158(b)(4)(ii)(B), which prohibits labor organizations to:

> (ii) threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is... (B) forcing or requiring any person...to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided*, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

A secondary boycott "generally involves a labor union's exertion of pressure on a neutral employer with whom the union has no dispute, in order to force the neutral employer to stop dealing with the primary employer."  *George v. Nat'l Ass'n of Letter Carriers*, 185 F.3d 380, 383 (5th Cir. 1999).  In this context, "primary" refers to D5 as the employer of the non-union workers.  [DE 284 at 4.]  "Secondary" refers to the church or the general contractor who employed D5 as a subcontractor.

---

[3] The pleading refers to the "Labor Management Relations Act" but cites §158, which is §8 of the NLRA.  The LMRA amended the NLRA to prohibit unfair labor practices by unions, including secondary boycotts.

Section 303 of the Labor Management Relations Act, 29 U.S.C. §187, makes it unlawful for a labor organization to engage in conduct defined to be an unfair labor practice in §8(b)(4) of the NLRA, and provides a private right of action for such violations.  "If a plaintiff's business was injured by a secondary boycott, a suit may be brought under §303 to recover for the loss sustained."  *Smart v. Internat'l Brotherhood of Elec. Workers, Local 702*, 453 Fed.Appx. 650, 653 (7th Cir. 2011). Furthermore, the law is clear that anyone harmed by a secondary boycott can bring suit; the statute is not limited to the neutral employer. *See Charvet v. Int'l Longshoremen's Ass'n, AFL-CIO*, 736 F.2d 1576-77 (D.C. Cir. 1984) (collecting cases).

Count I's theory is that Local 395 violated the secondary boycott provisions of §8 "by engaging in violence and other acts of restraint and coercion to obtain agreements" with the object "to cause the Dyer Baptist church, as owner of the JOB SITE, to change the way it does business with PLAINTIFF D5, cease doing business with PLAINTIFF D5 or other non-signatory LOCAL 395 contractors or cease doing business with PLAINTIFF D5 and other non-LOCAL 395 contractors and give the business instead to LOCAL 395 signatory contractors."  [DE 67, at ¶53.]

"A violation of Section 8(b)(4)(ii)(B) consists of two elements:  (1) a union engages in conduct that threatens, coerces, or restrains an employer or other person engaged in commerce; and (2) an object of the union's conduct is to force or require an employer or person not to handle the products of, or to do business with, another person." *Kentov v. Sheet Metal Workers' Intern. Ass'n Local 15, AFL-CIO*, 418 F.3d 1259,

1263 (11th Cir. 2005).  The Supreme Court has explained §8(b)(4)'s application to "secondary" situations:  "[t]his limitation was in 'conformity with the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own.'"  *National Woodwork Mfr. Ass'n v. N.L.R.B.*, 386 U.S. 612, 626-27 (1967) (quoting *N.L.R.B. v. Denver Bldg. & Const. Trades Council*, 341 U.S. 675, 692 (1951)).

The undisputed facts established by Veach and Williamson's plea stipulations include that they conspired together and with others "to use actual and threatened violence to obtain contracts for the union" in which they served as officers.  [Exh. A, ¶8; Exh. B, ¶8.]  They admit their intent was "to obtain for Local 395 a labor contract with D5 Iron Works...and/or a  business contract with Lagestee-Mulder."  [*Id.*]  They have conceded, without dispute, that "[t]he purpose of the [January 7] attack was to intimidate D5 and the general contractor, in order to get the D5 workers off the site and to get Local 395 ironworkers onto the site to complete the job," and that they "believed that the confrontation, and/or earlier threats, would result in obtaining a contract for Local 395 workers to complete the Church project."  [*Id.*]

Notwithstanding these admissions, Local 395 argues it cannot be held liable.  First, Local 395 argues that no secondary boycott is established because D5, the primary employer, was the principal target of the violence.  [DE 284 at 4-5.]  It is true that §158(b)(4) "permits a union to pressure an employer with whom it has a primary labor

16

dispute." *Tri-Gen Inc. v. Int'l Union of Operating Engineers, Local 150, AFL-CIO*, 433 F.3d 1024, 1034 (7th Cir. 2016). Nonetheless, "a union may not advance its cause by pressuring unrelated, secondary employers to stop dealing with the primary employer." *Id*. And such pressure on Dyer Baptist Church and Lagestee-Mulder was admittedly part of the intent of Williamson and Veach in orchestrating the events of January 6 and 7. Williamson has conceded that he "went across the street to the Dyer Baptist Church to persuade the church to stop work on the site and use union labor instead." [Exh. A, ¶8.] Veach and Williamson have each stipulated that "[t]hrough my actions, I sought to obtain for Local 395 a labor contract with D5 Iron Works...and/or a business contract with Lagestee-Mulder." [Exh. A, ¶8; Exh. B, ¶8.]

Even with mixed primary and secondary motives, the conduct was unlawful under §158(b)(4). *Mautz & Oren, Inc. v. Teamsters Union, Local 279*, 882 F.2d 1117, 1121 (7th Cir. 1989). "In such a situation, 'it is not necessary to find that the sole object of the strike was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary.'" *Tri-Gen*, 433 F.3d at 1034, quoting *Mautz & Oren*, 882 F.3d at 1121. Liability is not impacted because an unlawful practice is undertaken with intent to influence both the primary and secondary entities: "[i]t is not necessary to find that the *sole* object of the strike was secondary so long as *one of the union's objectives* was to influence another employer by inducing the struck employer to cease doing business what that other employer." *N.L.R.B. v. Enterprise Ass'n, etc.*, 429 U.S. 507, 530 n.17 (1977).

In sum, these facts satisfy the elements of a secondary boycott claim as a matter of law because they show that threats and violence were used against persons engaged in commerce with an objective of forcing Dyer Baptist and Lagestee-Mulder to cease doing business with D5 and hire union labor, and forcing D5 to bargain with Local 395. Unable to dispute what occurred, Local 395 vehemently disputes that it can be held liable for the conduct Veach and Williamson (and other union members) engaged in on January 6 and 7.

What are the standards that govern the critical issue of the local's responsibility for the admitted conduct and motives of Williamson and Veach?  In *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 216 (1979), the Supreme Court held that common-law rules of agency govern "the responsibility of unions for strikes in breach of contract."  The Supreme Court applied the agency law it found was adopted in §301 of the Taft-Hartley Act, 29 U.S.C. §185(b), which provides that "[a]ny labor organization which represents employees in an industry affecting commerce as defined in this chapter...shall be bound by the acts of its agents." Subsection (e) of §185 goes on to state that "in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

A more demanding agency standard is found in §6 of the Norris-LaGuardia Act, 29 U.S.C. §106, which provides that no organization participating or interested in a

18

labor dispute "shall be held responsible or liable...for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof."  Both sides acknowledge that this higher standard will apply to plaintiffs' tort claims.  [DE 267 at 15; DE 284, 10-11; DE 296 at 12.]  But definitions within the NLRA, which apply to construction and application of the secondary boycott provisions of §158(b)(4)(ii)(B), employ a broader definition of agency like the one found in §185(e): "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."  29 U.S.C. §152(13).

In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 736-37 (1966), the Supreme Court found that "Congress passed the Labor Management Relations Act, which expressly provides that for the purposes of that statute, including §303, the responsibility of a union for the acts of its members and officers is to be measured by reference to ordinary doctrines of agency, rather than the more stringent standards of [§106]."  In *Gibbs*, the court cited the definition in §152(13) as applicable to LMRA claims including secondary boycott claims under §303.  [*Id*. at 736, n.24.]  As labor law has been interpreted in *Gibbs*, "express authorization or ratification are not necessary for liability" on a secondary boycott claim.  *Lane Crane Service, Inc. v. Int'l Broth. of Elec. Workers, Local Union No. 177*, 704 F.2d 550, 554 (11th Cir. 1983).

Applying traditional doctrines of agency per *Gibbs*, the Indiana Court of Appeals held that a union was not liable for damages caused by a raid on an employer's non-union facility when the evidence supported only "[a]mbiguous threats, purposeless meetings and noninvolvement by union officers and employees." *Bottoms v. B&M Coal Corp*, 405 N.E.2d 82, 90-91 (Ind.Ct.App. 1980). More analogous to this case is *Local Union No. 115 v. Indiana Glass Co.*, 771 N.E.2d 1193 (Ind.Ct.App. 2002), in which "union officers were stationed near the location where the repeated unlawful acts took place," and "one of the union's national representatives approved of the beating an Indiana Glass employee received at the hands of the strikers." *Id*. at 1201. Such facts "may give rise to liability of the organization." *Id*.

Likening the situation to vicarious liability in the employment context, the liability of Local 395 is clear. Under the doctrine of *respondeat superior*, the master is liable for the servant's tortious acts if they occurred within the scope of employment. *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 460 (2018). "Ultimately, the scope of employment encompasses the activities that the employer delegates to employees or authorizes employees to do, plus employees' acts that naturally or predictably arise from those activities." *Id*. at 461. This means that an employer may be liable even for "acts that the employer expressly forbids; that violate the employer's rules, orders, or instructions; that the employee commits for self-gratification or self-benefit; that breach a sacred professional duty; or that are egregious, malicious or criminal." *Id*. Under Indiana law, "the employer need not authorize the tortious act for it to fall within the

20

scope of employment." *Id.* at 464. The focus of the inquiry is "the context in which the commission of the wrongful act arose," including whether the actions were taken to further the employer's business and motivated by the employer's interests. *Barnett v. Clark*, 889 N.E.2d 281, 285 (Ind. 2008) (quoting *Stropes ex rel. Taylor v. Heritage House Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 249 (Ind. 1989)).

By their own admission, Veach and Williamson acted to further Local 395's interests, a purpose well within their responsibilities as business agents of Local 395. Their actions cannot be deemed what the Restatement of Agency calls an independent course of conduct not intended to serve any purpose of their principal, Local 395. Restatement (Third) of Agency, §7.07(1) (2006). Their actions in leading the secondary boycott activity arose from the context of their responsibilities for Local 395. *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 464 (2018). Although whether particular acts come within the scope of employment is generally a fact question for a jury, on the undisputed facts in this case, a reasonable jury could only conclude that these circumstances support Local 395's liability for the conduct of Veach and Williamson under Indiana's ordinary principles of agency.

Veach and Williamson acted in their capacity as representatives of Local 395 and with the intent to benefit the union. Each of them stipulated that he "sought to obtain for Local 395 a labor contract with D5 Iron Works...and/or a business contract with Lagestee-Mulder." [Exh. A, ¶8; Exh. B, ¶8.] Williamson approached the job site to try to persuade the owner of D5 to sign on with Local 395 or stop work on the project.

21

[Exh. A, ¶8.]  The violent attack on D5 workers occurred the day after Williamson was rebuffed by D5's owner and was unsuccessful in his advocacy against D5 (and for Local 395) with the Associate Pastor of Dyer Baptist Church, the owner of the construction project.  Thereafter, Veach and Williamson gathered up rank-and-file union members and returned to the worksite for an attack on the non-union employees of D5.  Williamson and Veach have admitted that "the purpose of the attack was to intimidate D5 and the general contractor, in order to get the D5 workers off the site and to get Local 395 ironworkers onto the site to complete the job."  [Exh. A, ¶8; Exh. B, ¶8.]  These admissions defeat Local 395's efforts to distance itself from the secondary boycott activity.  As a matter of law on the undisputed facts, Local 395 is liable to plaintiff D5 on Count I of the First Amended Complaint.

## Count II – Tortious Interference with Prospective Economic Advantage

Count II begins a long series of tort claims asserted in the First Amended Complaint.  As I referenced earlier, the parties agree that the standards for holding the local union accountable for the conduct of its agents are different for tort claims than for the secondary boycott claim in Count I.  Even the higher standard requiring union participation, authorization or ratification has been met by the undisputed evidence that Local 395's two business agents organized and participated in actual violence with the purpose that it bring about the end of the non-union employer's contract and its replacement with Local 395 ironworkers.

In Count II, all the plaintiffs allege that all named defendants are liable for "causing PLAINTIFFS economic harm from such tortuous (sic) interference regarding economic advantage and causing each of PLAINTIFFS to lose substantial numbers of jobs." [DE 67 at ¶55.] Plaintiffs' argument for summary judgment on this claim is startlingly brief and conclusory, consisting almost entirely of the recitation of the tort's elements. [DE 267 at 20-21.] In both the First Amended Complaint and in their summary judgment briefing, plaintiffs have been less than clear on the theory of Count II.

The temporal scope of the allegations is "[s]ince on or about January 6, 20[16] and continuing...." [DE 67 at ¶55.] There is a doubly plural reference in Count II to "substantial numbers of jobs," further suggesting a theory about impediments to jobs in the future beyond the Dyer Baptist Church contract. [DE 67 at ¶55.] This sort of suggestion is repeated in the reference to "prospective advantage for future contracts and employment." [*Id.* at ¶56.] In its brief in support of the summary judgment motion, the sole sentence addressing plaintiffs' theory of this tort asserts that "D5 suffered damages through denial of further work with Lagustee-Mulder[.]" [*Id.* at 21.]

Local 395 responds that D5 is confusing or conflating the torts applicable to existing contracts or relationships with prospective ones. In truth, the two torts have very similar elements. Plaintiffs have quoted the elements of the tort that the late Judge Sharp of this court also described as tortious interference with prospective business advantage: (1) the existence of a valid business relationship; (2) the defendant's

knowledge of the relationship; (3) the defendant's intentional interference in the relationship; (4) the absence of any justification; and (5) damages resulting from the defendant's interference.  [DE 267 at 20.]  *See Patriot Homes, Inc. v. Forest River Housing, Inc.*, 489 F.Supp.2d 865, 872 (N.D.Ind. 2007).  Other courts reciting these same elements have referred to the tort as tortious interference with business relationship.  *See, e.g., Harvest Life Ins. Co. v. Getche*, 701 N.E.2d 871, 876 (Ind. Ct. App. 1998).   One distinction from tortious interference with contract is that a claim for business interference has the additional element "that a defendant acted illegally in achieving his end."  *Harvest Life*, 701 N.E.2d at 876.  *See also CouponCabin LLC v. Savings.com, Inc.*, Cause No. 2:14-CV-39-TLS, 2017 WL 83337, *5 (N.D.Ind.  Jan. 10, 2017) (Springmann, J.) (adding the sixth element as "illegal conduct").

The principal shortcoming of D5's motion for summary judgment as to Count II is the lack of discussion or analysis demonstrating *how* the established facts support liability for a particular theory of tortious interference.  The brief discussion of the tort in D5's opening brief cites no evidence and offers no explanation of the business relationship at issue.  The factual allegations of the First Amended Complaint (and those found to be undisputed for the purposes of D5's summary judgment motion) could be thought to state a claim for interference with D5's *existing* contract on the Dyer Baptist Church job, but are not shown to encompass a theory of interference with future contracts or other business.

Local 395 aptly makes this precise point in its opposition:  "Plaintiffs have failed to show that some prospective economic advantage existed as required by the relevant case law.  There is nothing in the current record or Plaintiffs['] Statement of Facts that indicates that D5 lost out on prospective economic advantage with Lagestee-Mulder[.]"  [DE 284 at 13.]  For similar reasons, defendant Williamson has moved for summary judgment on Count II in his separate motion for partial summary judgment, in which Local 395 has joined.  [DE 187 at 18-19; DE 188 at 1.]  Williamson argues that plaintiffs have failed to identify particular prospective economic advantages allegedly impaired by defendants, and have no evidence that defendants actually knew of them and intended to interfere with them.  [*Id.*]

In reply, D5 relies on its brief in opposition to defendant Williamson's motion for partial summary judgment.  [DE 296 at 15.]  There D5 argues that the undisputed evidence supports a conclusion that Local 395, Veach and Williamson intentionally interfered with the "contract [that] existed between Dyer Baptist Church and the general contractor of the school construction."  [DE 289 at 20.]  This doesn't sound like the same contention as D5 made in its opening brief about "*further* work with Lagustee-Mulder[.]"  [DE 267 at 21 (emphasis added).]  The confusion is exacerbated by the pleading of Count II and its several references to future rather than current contracts and employment.

Additional uncertainty exists with respect to the claim as asserted by different plaintiffs.  Both Count II and the summary judgment motion are brought on behalf of all

25

the plaintiffs, D5 as well as the individual employees.  But the briefs in support of the motion fail altogether to address how the individual plaintiffs suffered actionable tortious interference.  On this messy record, I have to agree with Local 395 that plaintiffs have not shown an entitlement to judgment as a matter of law on a claim for tortious interference with prospective economic advantage, and summary judgment will be denied as to Count II.

On the other hand, the motion by Williamson and Local 395 creates the "put up or shut up" moment for plaintiffs on Count II.  As I've already explained, plaintiffs' approach to Count II presents a moving target that has most recently settled on a theory of interference with D5's business on the Dyer Baptist school project.  But on this argument plaintiffs do have evidence of defendants' knowledge of plaintiffs' economic prospects, and an intent to interfere.  So defendants' motion for summary judgment on Count II will also be denied.  Although plaintiffs' poor treatment of Count II doesn't support summary judgment in their favor, they have lately identified a theory and evidence sufficient to keep the count alive for now.

**Counts III, VI, XII, and XV – Assault**
<u>**Counts IV, VII, and XIII – Battery**</u>

Each of the individual plaintiffs has a claim for assault in the First Amended Complaint — Count III on behalf of Lindner, Count VI for Kudingo, Count XII for Harper, and Count XV for Tonnesen.  Three of the four individual plaintiffs also have a claim for battery — Count IV on behalf of Lindner, Count VII for Kudingo, and Count

XIII for Harper. [4]  The heading of Count IV, Lindner's claim for battery, indicates that the claim is pled against defendant Williamson, based upon the battery committed by Williamson when he "grabbed Lindner."  [DE 67 at ¶64.]  The substantive content of the allegations in ¶¶63-65 do not make clear that relief is sought against Williamson alone, and not against Local 395.  Plaintiffs seek summary judgment as to liability on all their claims for assault and battery against Local 395, Veach and Williamson.

Neither Veach nor Williamson has filed any opposition to the request for summary judgment on the assault and battery claims. [5]  In view of the undisputed facts, and the apparent concession by Veach and Williamson, summary judgment as to liability will be granted in favor of plaintiffs and against Veach and Williamson on Counts III, IV, VI, VII, XII, XIII and XV.

Local 395 disputes its liability on these claims, arguing that the plea stipulations of Williamson and Veach do not expressly admit that they committed any assault and battery that occurred on January 7.  [DE 284 at 16.]  The union suggests that it would have no liability for such torts if committed by rank-and-file members who are not employees of the union.  [*Id*.]  The vicarious liability standard of §106 "applies to federal

---

[4] The First Amended Complaint does not contain factual allegations of physical violence on Tonneson, and does not contain a battery claim on his behalf.  Nonetheless, in plaintiffs' opening brief, they assert that "[d]uring the attack described in the complaint and the plea agreements, Lindner, Kudingo, *Tonneson*, Weil, and Harper were also physically struck without their consent."  [DE 267 at 22 (emphasis added).]  Because the pleading governs the claims asserted, I will give no consideration to any claim by Tonneson for battery.

[5] Williamson has filed a response to plaintiffs' motion for summary judgment that addresses only particular claims (Counts I, II, XVIII, XIX, and XX) and damages theories, but not any of the claims for assault or battery.

court adjudications of state tort claims arising out of labor disputes." *Gibbs*, 33 U.S. at 737.  In order to establish Local 395's liability for the various assaults and batteries, plaintiffs must demonstrate, by the enhanced burden of "clear proof," Local 395's actual participation in, actual authorization of, or ratification of the tortious conduct after actual knowledge of it. 29 U.S.C. §106.  The statutory language – "unlawful acts of individual officers, members, or agents" – indicates that if the participation, authorization or ratification standard is met, the union can be vicariously liable even for conduct by rank-and-file members.  *Gibbs*, 383 U.S. at 735-36; *United Brotherhood of Carpenters and Joiners of America v. United States*, 330 U.S. 395, 403 ( 1947).

As the Supreme Court indicated in *Gibbs*, "[t]he relevant question is whether [union] representatives were clearly shown to have endorsed violence or threats of violence as a means of settling the dispute."  383 U.S. at 741.  Whether or not the undisputed evidence establishes that Veach or Williamson threw any punches or kicked any of the victims, the evidence establishes that Veach and Williamson organized the Local 395 members and orchestrated their descent on the employees of D5, in which Veach and Williamson participated.  Both of them stipulated to conspiring "to use actual and threatened violence" and to initiating the January 7 confrontation in which the assaults and batteries occurred.  [DE 267-1 at 7-8, ¶8; DE 267-1 at 16-17, ¶8.] Williamson and Veach, as officials of Local 395, are clearly shown to have participated in the violence that occurred, and to have authorized its use by whichever Local 395 members actually perpetrated particular acts of assault or battery.

My determination that plaintiffs are entitled to summary judgment against Local 395 for their claims of assault and battery will be predicated on the participation and authorization prongs of the §106 standard.  I do not undertake a determination whether the union could be said, as a matter of law, to have ratified the assaults and batteries because it is unnecessary to do so, and because the conclusion is less certain.  In support of a finding of participation and/or authorization, plaintiffs have several undisputed facts in their favor.  Local 395 has never repudiated the violence against plaintiffs, nor has it undertaken any investigation into the tortious conduct, or imposed any discipline against any member for involvement in the attack.  All of this remained true even after the guilty pleas of Veach and Williamson made their responsibility for and involvement in the attack plain and public in January 2020.  Participation and authorization are sufficient to support Local 395's liability for the assault and battery claims that Veach and Williamson themselves do not oppose.  Summary judgment will therefore be granted against Local 395 on the assault and battery claims of plaintiffs Lindner, Harper, and Kudingo, and the assault claim brought by plaintiff Tonnesen.

**Counts V, VIII, XIV, and XVI  – Intentional Infliction of Emotional Distress**

Plaintiffs Lindner (in Count V), Kudingo (Count VIII), Harper (Count XIV) and Tonnesen (Count XVI) assert claims for intentional infliction of emotional distress. Under Indiana law, proof of this tort requires a showing that a defendant engaged in extreme and outrageous conduct which intentionally or recklessly caused severe emotional distress to another.  *Neff v. Wal-Mart Stores East,* LP, 113 N.E.3d 666, 673

(Ind.Ct.App. 2018).  The standard is a high one.  For conduct to be extreme and outrageous, it must "go beyond all bounds of decency" and "be regarded as atrocious, and utterly intolerable in a civilized community.'"  *Branham v. Celadon Trucking Services, Inc.*, 744 N.E.2d 514, 523 (Ind.Ct.Ap.. 2001).  As with the claims for assault and battery, defendants Williamson and Veach put up no resistance to the motion for summary judgment, which will be granted as against them on each of these claims.

Local 395 disputes whether the facts establish conduct sufficiently outrageous to support liability for intentional infliction of emotional distress.  [DE 284 at 18.]  The contention is almost laughable, and shows a callousness akin to that shown by Veach and Williamson's crew on January 7, 2016.  The undisputed facts are that the Local 395 bunch, with Veach and Williamson at the helm, descended on the plaintiffs as they went about their work, and without provocation "attacked the D5 workers and beat them with fists and loose pieces of hardwood, kicking them while they were on the ground."  [Exh. A, ¶8; Exh. B, ¶8.]  The attack on Kundingo was so vicious that he was stomped on and kicked in the face so as to fracture his jaw in three places.  The plaintiffs reasonably feared for their lives.  That this conduct was beyond all bounds of decency, atrocious, and utterly intolerable is beyond debate.

To the extent the union suggests that an intent to cause emotional harm is necessary, the law is otherwise.  Extreme and outrageous conduct that *recklessly* causes emotional distress also supports liability.  *Neff*, 113 N.E.3d at 673.  In any event, the

purpose of the union crew assembled by Veach and Williamson— to physically assault the D5 workers in a potentially life-threatening manner so as to scare them off the job— likely meets an intentional standard but surely meets one of recklessness. The admitted purpose was to "intimidate" the D5 workers, which by definition is to deliberately cause emotional distress in the form of fear. The facts meet the "intent" standard of the tort.

Finally Local 395 repeats its challenge to vicarious liability for the conduct that occurred. [DE 284 at 19.] In the context of intentional infliction of emotional distress, the admitted conduct and confessed intent of Local 395 representatives Veach and Williamson are sufficient to find the union liable on the §106 standard. Whether or not Veach and Williamson themselves landed any of the blows, they have admitted that they gathered up other Local 395 members to return to the jobsite to "initiate[] the confrontation" (a very euphemistic term for a violent assault) for the purpose of "intimidat[ing] D5 and the general contractor, in order to get the D5 workers off the site and to get Local 395 ironworkers onto the site to complete the job." [Exh. A, ¶8; Exh. B, ¶8.] This is clear proof of Veach and Williamson's actual participation in conduct that meets the standards for intentional infliction of emotional distress, and supports the vicarious liability of Local 395 for that tort as inflicted on Lindner, Harper, Kudingo and Tonnesen. As a matter of law, Local 395 is liable on Counts V, VIII, XIV and XVI.

**Count XVII  – Failure to Supervise**

Count XVII of the First Amended Complaint contains a claim by plaintiffs against Local 395, Williamson and Veach for failure to supervise, based on the allegations that Williamson and Veach, as agents of Local 395, pooled members together, transported them to the job site, planned and were present during the members' assault on the plaintiffs, and took no action to prevent the beatings of Kudingo, Weil and Harper and the assault on Lindner.  [DE 67 at 34.] Indiana recognizes a claim for negligent supervision to "impose liability on an employer when an employee acts beyond the scope of his or her employment to commit a tortious injury upon a third party."  *Johnson v. South Bend Community School Corporation*, 3:17-cv-00825-PPS, 2018 WL 2336072, at *6 (N.D.Ind.  May 22, 2018) (citing *Perron v. JP Morgan Chase Bank, N.A.*, 1:12-cv-01853-TWP-TAB, 2014 WL 931897, at *5 (S.D.Ind.  Mar. 10, 2014).

In opposition to summary judgment on the claim for failure to supervise, Local 395 points out that this cause of action "contradicts the Plaintiffs' other claims against Local 395 in that those other claims depend essentially on proof that the individual Defendants' conduct was carried out within the scope of their authority or reasonably in pursuit of an appreciable and rational benefit to the union." [DE 284 at 20-21.]  In their reply, plaintiffs offer no response at all in support of the failure to supervise claim, which may signify their recognition that they cannot recover on alternative causes of action requiring contradictory conclusions.

32

In any event, I agree that D5's theory of vicarious liability for all previous claims involved the assertion – and my finding – that Veach and Williamson were acting within the scope of their authority as business agents of the union.  In *Johnson*, I noted the contrast between claims for failure to supervise and claims based on a theory of *respondeat superior*.  *Johnson*, 2018 WL 2336072, at *5.  *See also Friday v. Magnifique Parfumes and Cosmetics, Inc.*,  3:17-CV-380 JD, 2017 WL 6048887, at *1 (N.D.Ind.  Dec. 7, 2017).  In light of the mutual exclusivity of the two theories of vicarious liability, and my previous determination of Local 395's liability because its agents acted within the scope of their employment, summary judgment is inappropriate on Count XVII against any defendant, and will be denied.

**Count XVIII – Interference with Lawful Occupation**

The First Amended Complaint describes Count XVIII as a claim for "Intentional Interference with Right to Pursue a Lawful Occupation."  [DE 67 at 35.]  The content of Count XVIII is reminiscent of the allegations made in support of Count II for "Interference with Prospective Economic Advantage," although with a focus on the individual plaintiffs' loss of "substantial numbers of jobs and days of employment," rather than on D5's business.  [*Id*. at ¶144.]  Distinct from Count II, however, is that in support of their motion for summary judgment on Count XVIII, plaintiffs cite portions of the Indiana Bill of Rights, Art. 1, §§1 and 23, that have been construed to recognize "personal privileges and liberties" including an "individual's right to engage in a lawful business."  *State Board of Barber Examiners v. Cloud*, 44 N.E.2d 972, 980 (Ind. 1942).

Plaintiffs summarily contend that "Defendants' tortious interference in Plaintiffs' lawful right to work in Indiana by felonious means are (*sic*) actionable," noting also that Indiana's Right to Work Law "bars compulsion of union membership." [DE 267 at 23-24.] Whether the conduct at issue in this case constituted an attempt to compel union membership in violation of the Right to Work law will be addressed below in the analysis of Count XIX, a claim expressly based on that law. For now, my focus is on Count XVIII and whether the claim of intentional interference with pursuit of a "lawful occupation" must go forward.

Local 395 opposes summary judgment on the ground that plaintiffs fail to cite any legal authority for a private right of action of the type asserted in Count XVIII. [DE 284 at 23.] Defendant Williamson asserts the same argument, citing cases for the proposition that courts are "encouraged to dismiss actions based on novel state law claims." [DE 187 at 17.] Relying on this argument, Williamson and the union actually seek summary judgment in their favor on Count XVIII. [DE 187 at 16-17; DE 188 at 1.][6] In reply, plaintiffs contend that "the cause of action for tortious interference with lawful

---

[6] From what is an acorn of facts, this oak tree of litigation has resulted. The number of counts in the amended complaint hasn't helped. What's worse is that counsel have made a poor choice with respect to briefing summary judgment on Counts XVIII, XIX and XX, namely incorporating by reference their argument from the briefing on other motions. In opposition to plaintiffs' motion, Local 395 invokes three previous filings, DE 179, 180 and 215. [DE 284 at 24.] Defendant Williamson references DE 179, 180, 187 and 217. [DE 285 at 1-2.] In their reply, plaintiffs incorporate by reference previous filings at DE 287 and 289. [DE 296 at 15.] Given the proliferation of separate pending motions and the associated difficulty of digesting the parties' arguments on each, counsel would have done better to copy the pertinent portions of previously filed briefs into any subsequent brief rather than expect the court to detour to a different motion's briefing (a total of seven additional briefs) to hunt down the party's position.

34

occupation has been an Indiana tort for at least 71 years," citing *Dept. of Ins. v. Schoonover*, 72 N.E.2d 747 (1947).

*Schoonover* involved a constitutional challenge to an Indiana statute limiting the issuance of licenses to fire and casualty insurance agents. *Id*. at 748. The Supreme Court found that the statute was not a reasonable exercise of the State's police power and was unconstitutional. *Id*. at 749-750. *Schoonover* is brought against State defendants concerning a state statute, both of which are subject to the limitations of the State Constitution. *Schoonover* does not recognize a tort claim that can be asserted against a private party. Neither does *State Board of Barber Examiners*, the case plaintiffs principally cite for the cause of action in Count XVIII, which is also a challenge to the constitutionality of state action, an administrative order of the State Board of Barber Examiners. *Id*., 44 N.E.2d at 555-56, 573-74. The "right to engage in a lawful business" language within *State Board* is said to derive from yet another case involving a challenge to the constitutionality of a statute. *Id*. at 573, citing *Street v. Varney Electrical Supply Co.*, 66 N.E. 895 (1903).

Plaintiffs also rely upon the U.S. Supreme Court's decision in *Int'l Union, United Automobile, Aircraft and Agricultural Implement Workers of America v. Russell*, 356 U.S. 634 (1958). There the Supreme Court affirmed a judgment for an Alabama plaintiff against a union on a claim of malicious interference with his lawful occupation. *Id*. at 635. The issue before the court was not the existence of the tort under Alabama law, but whether the claim was within the exclusive jurisdiction of the National Labor Relations Board.

*Id*. *Russell* does not support a conclusion that Indiana recognizes such a tort claim. Neither does the case of *Speckman v. City of Indianapolis*, 540 N.E.2d 1189 (Ind. 1989), which is another case involving a constitutional claim against a government entity, namely a due process claim concerning loss of public employment.  In *Speckman*, the Indiana Supreme Court does not discuss a right to pursue a lawful occupation derived from Article 1 of the state Constitution and does not recognize a tort of the kind plaintiffs plead in Count XVIII.

The availability of a cause of action under the Indiana Constitution cannot be presumed, especially not by a federal judge.  Federal courts have long "declined to recognize an implied right of action for damages directly under the Indiana Constitution, at least absent a clear indication from Indiana courts that such an action is available." *McConnell v. McKillip*, 573 F.Supp.2d 1090, 1103 (S.D.Ind. 2008) (collecting cases). If Indiana wishes to expand its panoply of tort remedies then it's best left to the state judiciary and the state legislature to do it. For now, it's enough to simply quote the Indiana Supreme Court's rejection of any such claim: "There is no explicit language in the Indiana Constitution providing any specific remedy for violations of constitutional rights." *Cantrell v. Morris*, 849 N.E.2d 488, 499 (Ind. 2006)

Count XVIII is a road to nowhere. No such cause of action has been recognized under Indiana law when asserted against a non-governmental actor.  Plaintiffs will therefore be denied summary judgment on Count XVIII, and instead summary judgment will be granted to defendants.

## Count XIX – Intentional Interference with Right to Work Non-Union

Count XIX is identified as a claim for "Intentional Interference with Right to Work Non-Union," invoking section 8 of Indiana's Right to Work Act, Indiana Code §22-6-6-8. That law provides that "[a] person may not require an individual to...(1) become or remain a member of a labor organization...as a condition of employment or continuation of employment." Sections 8 through 12 of the Right to Work law have been referred to as "the substantive provisions of the legislation." *Sweeney v. Pence*, 767 F.3d 654, 667 (7th Cir. 2014). The provision relied on in Count XIX, Ind. Code §22-6-6-8, "spells out the principal prohibitions of the Right to Work Act." *Id*. at 657. An individual who suffers an injury from a violation of Indiana's Right to Work law can bring a civil action in which damages and other remedies may be recovered. Ind. Code §22-6-6-12(a) & (b).

The allegations in support of Count XIX include that defendants interfered with the individual plaintiffs' "right to work without membership in a labor organization." [DE 67 at ¶148.] In support of summary judgment in their favor, plaintiffs argue that the attack on them was a "scheme...to deny them their statutory right to choose whether to become Local 395 members." [DE 267 at 24.] They further reason that the individual plaintiffs' "choice not to become members of Defendant Local 395's labor organization under Indiana law caused them to endure and suffer violence, and physical and economic torts at the hands of the Union, Veach, Williamson, and their rank and file members." [*Id*.]

On this count, Local 395 and defendant Williamson not only oppose summary judgment for plaintiffs, but have filed a cross-motion for summary judgment in their favor.  [DE 179; DE 186.]  My discussion of Count XIX will apply to both sides' motions, which fundamentally raise a legal question of interpretation of Indiana's Right to Work law.  The union argues that Indiana's Right to Work statute is concerned with "union security agreements which require membership in a labor organization as a condition of employment," and because D5 is a non-union contractor, on the facts of this case "no violation of the Indiana Right to Work statute is possibly involved here."  [DE 180 at 4.]  In sum, Local 395 contends that "[n]othing involved in the conduct alleged on the part of these defendants remotely fits the prohibitions of, or triggers the application of IC 22-6-6-8."  [DE 180 at 9.]

"If an Indiana statute is not ambiguous, the court will give effect to the plain, ordinary, and usual meaning of the language of the statute."  *United States v. Smith*, 668 F.3d 427, 431 (7th Cir. 2012).  I agree that, because the statute by its terms only prohibits agreements or practices that require union membership or the payment of union dues as conditions of employment, the statute is not implicated by what occurred here.

The evidence of record explains the motivation for the assault on the individual D5 workers on January 7.  Veach stipulated:

> I knowingly and intentionally agreed and conspired with my co-defendant, Thomas Williamson Sr., and others, to use actual and threatened violence to obtain contracts for the union in which I served as an officer, Ironworkers Local 395.  Through my actions, I sought to obtain for Local 395 a labor contract with D5 Iron Works, an Illinois steelworking

company ("D5"), and/or a business contract with Lagestee-Mulder, an Illinois construction company....

...The purpose of the attack was to intimidate D5 and the general contractor, in order to get the D5 workers off the site and to get Local 395 ironworkers onto the site to complete the job.  I believed that the confrontation, and/or earlier threats, would result in obtaining a contract for Local 395 workers to complete the Church project.

[Exh. A, ¶8.]  Williamson's plea stipulation contained the same explanation.  [Exh. B, ¶8.]

The undisputed evidence indicates that the violent attack on D5's employees by representatives of Local 395 was not designed to "require" those individuals to do anything other than leave the job and make way for union ironworkers.  Instead, the attack was intended to compel the victims' non-union employer to give up on the job, and for the church and general contractor to use Local 395 labor in their place.  The conduct of the defendants did not involve imposing, or attempting to impose, a "condition of employment" on Lindner, Kudingo, Weil, Harper and Tonnesen, as defendants were not employers offering employment to the victims of the attack and were not attempting to enforce a bargaining agreement requiring union membership.

Plaintiffs' reliance on *Warner v. Chauffeurs, Teamsters, and Helpers Local Union No. 414*, 73 N.E.3d 190 (Ind.Ct.App. 2017), is unhelpful.  *Warner* involved some employees' claim against their employer and a union that the employees were being required to be members of Local 414 and remit union dues.  *Id.* at 193, 196.  These allegations clearly fall within the ambit of Ind. Code §22-6-6-8, given the presence of a collective bargaining agreement and the employee-plaintiffs being dues-paying members of a

39

union.  By contrast, this case simply does not involve "employer-union acts that compel union membership" or "any agreement between the Union and Employer."  *Id*. at 196. There is no evidence that Local 395 ever required an employee of D5 to become or remain a member of the union as a condition of employment.

Plaintiffs ignore the final clause of §22-6-6-8 – "as a condition of employment or continuation of employment."  Beating up D5 employees because they were non-union is not the same as *requiring them* to join a union *as a condition of* continued employment, as is prohibited by I.C. §22-6-6-8.[7]  In his deposition, D5 owner Richard Lindner testified that "[n]o one's mandating that we join a labor union," and "[t]hey haven't done anything to make me join a union."  [DE 179-1 at 71 (242:13-14 & 243:22-23).]   The facts of the case just don't fit the prohibition of §22-6-6-8. The admitted violent conduct was reprehensible, and is clearly actionable in tort and on other causes of action, but it does not constitute a Right to Work violation.  Plaintiffs do not show an entitlement to summary judgment on Count XIX.  To the contrary, because I conclude as a matter of law that the undisputed facts do not demonstrate a violation of the Indiana's Right to Work statute as alleged, defendants are entitled to summary judgment on Count XIX.

---

[7] Local 395 maintains that interference with the plaintiffs' right to be non-union is not a right to work violation, but instead an "alleged violation of Section 29 U.S.C. §158(b)(1)...which falls under the exclusive jurisdiction of the NLRB" and so is preempted.  [DE 215 at 3.]  I need not address this analysis, but instead focus on whether or not Count XIX as alleged and the facts as proven constitute a violation of Indiana's Right to Work statute.

**Count XX – Civil Conspiracy**

In the final count of the First Amended Complaint, plaintiffs assert a claim for civil conspiracy against all defendants.  [DE 67 at 40.]  The facts alleged in support of Count XX are that all the defendants made an agreement to commit an unlawful attack against the plaintiffs by unlawful means, and that at least one tortious act (the battery of Kudingo) was committed in furtherance of the agreement.  [*Id*. at ¶¶156, 157, 158.] Again plaintiffs' summary judgment analysis is brief and conclusory.  After citing Indiana cases on civil conspiracy, plaintiffs conclude with a single sentence of presumptive analysis:  "Veach and Williamson admit to a Hobb's (*sic*) Act Extortion Conspiracy, a combination complete at common law as officers of Local 395 performing their jobs for Local 395."  [DE 267 at 25.]

The union opposes summary judgment on the ground that "[i]n Indiana, there is no separate civil cause of action for conspiracy."  [DE 284 at 24.]  Defendant Williamson echoes this argument in his motion seeking summary judgment on Count XX, in which Local 395 joins.  [DE 187 at 17; DE 188 at 1.] The defendants' analysis of the conspiracy claim is correct.

In *Birge v. Town of Linden*, 57 N.E.3d 839, 845 (Ind.Ct.App. 2016), the Indiana Court of Appeals defined a civil conspiracy as "a combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means," quoting *Miller v. Cent. Ind. Cmty. Found.*, 11 N.E.3d 94, 962 (Ind.Ct.App. 2014).  *Birge* went on to note that a civil conspiracy is "not

41

an independent cause of action....It must be alleged with an underlying tort." *Birge*, 57 N.E.3d at 846. Other Indiana cases have used the same or similar language. *See, e.g., Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d 646, 653 (Ind.Ct.App. 2014); *see also Axelrod v. Anthem, Inc.*, 169 N.E.3d 131, 143 (Ind.Ct.App. 2021).

In sum, civil conspiracy is a theory of liability when paired with an underlying tort; it's not a separate claim. In this case, it is entirely unclear what tort or torts underlie the civil conspiracy claim. Plaintiffs again appear to take for granted that the facts established by Veach's and Williamson's plea stipulations summarily entitle plaintiffs to judgment in their favor, without offering any analysis to support the conclusion. Count XX refers to the battery of Kudingo, but since summary judgment has already been granted on that claim (as discussed above), it would be redundant and pointless to analyze the Kudingo battery claim through a conspiracy lens. As for any other tort claim by plaintiffs, summary judgment will be granted to the defendants on any theory based on a civil conspiracy because, after being challenged by defendants' summary judgment motion, plaintiffs have failed to demonstrate how the undisputed facts entitle them to judgment on a theory of civil conspiracy.

**Conclusion**

As a matter of law, plaintiff D5 Iron Works has demonstrated an entitlement to judgment on its secondary boycott claim in Count I of the First Amended Complaint. On the claim of Interference with Prospective Economic Advantage in Count II, summary judgment will be denied to both plaintiffs and defendants. On the assault

and battery claims of the remaining plaintiffs, as well as their claims for intentional infliction of emotional distress, summary judgment will be granted to each plaintiff against defendants Veach, Williamson and Local 395.  I will deny plaintiffs summary judgment on their failure to supervise claim in Count XVII.  On the final three claims, Counts XVIII (Interference with Lawful Occupation), XIX (Violation of Plaintiffs' Rights under Indiana's Right to Work Act) and XX (Civil Conspiracy), I conclude that defendants are entitled to summary judgment.

The title of plaintiffs' motion for partial summary judgment on liability references "Permanent Injunctive Relief Against Local 395."  [DE 263.]  The brief text of the motion does not mention injunctive relief.  [*Id.*]  Nowhere in the 28 pages of plaintiffs' Memorandum of Law in Support [DE 267] do they address injunctive relief and attempt an explanation of its appropriateness at this stage of the litigation, when final judgment is not yet sought.  I will likewise give the issue no further consideration at this point in the proceedings.

Defendant Williamson's motion for partial summary judgment addresses several of plaintiffs' damages theories.  I will defer consideration of those arguments to a separate opinion in which other motions pertaining to proof of damages will be addressed.  These include Local 395's Rule 37(c)(1) Motion to Exclude Evidence and Testimony of Timothy Cryer [DE 181], Local 395's *Daubert* Motion to Exclude the Report and Testimony of Paul Maurin [DE 182], and plaintiffs' Motion in Limine to Preclude Testimony of Defendants' Expert Michael Pakter [DE 265].

**ACCORDINGLY:**

Plaintiffs' "Motion to Admit the Criminal Convictions of Defendants Veach and Williamson to Conclusively Establish Facts and Collateral Estoppel" [DE 261] is GRANTED to the extent that it seeks to admit the undisputed facts stipulated by Veach and Williamson in connection with their guilty pleas, and is DENIED to the extent it seeks a summary conclusion as to any defendant's liability in this case.

Plaintiffs' Motion for Partial Summary Judgment and Permanent Injunctive Relief Against Local 395 [DE 263] is GRANTED IN PART as to plaintiff D5 Iron Works' secondary boycott claim in Count I as against defendant Local 395, and in favor of each individual plaintiff and against defendants Local 395, Veach and Williamson on the claims for Assault, Battery and Intentional Infliction of Emotional Distress in Counts III, IV, V, VI, VII, VIII, XII, XIII, XIV, XV, and XVI , and DENIED IN PART as to Count II (for Tortious Interference with Prospective Economic Advantage), Count XVII (against Local 395 for Failure to Supervise), Count XVIII (for Interference with Lawful Occupation), Count XIX (for Violation of Plaintiffs' Rights under Indiana's Right to Work Act) and Count XX (for Civil Conspiracy).

Defendant Local 395' Motion for Summary Judgment on Count XIX [DE 179] (for Violation of Plaintiffs' Rights under Indiana's Right to Work Act), joined in by defendant Williamson, Sr. [DE 259] and by defendant Veach [DE 203, 260], is GRANTED.

Defendant Thomas Williamson, Sr.'s Motion for Partial Summary Judgment [DE 186], joined in by defendant Local 395 [DE 188] and defendant Veach [DE 260], is DENIED as to Count II, and is GRANTED as to Count XVIII (for Interference with Lawful Occupation) and Count XX (for Civil Conspiracy).

SO ORDERED.

ENTERED: January 5, 2022.

_____/s/ Philip P. Simon_____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

45